# EXHIBIT "1"



# FACTORING AND SECURITY AGREEMENT

THIS FACTORING AND SECURITY AGREEMENT ("Agreement") is made as of **October 29, 2012** by and between **MIDWEST CARRIER SYSTEM, INC.** ("Client") and Advance Business Capital LLC ("Company").

1. <u>Definitions and Index to Definitions</u>. The following terms used herein shall have the following meaning. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code or the Interstate Commerce Termination Act of 1995 (Title 49 U.S.C.) and its implementing regulations.

   1.1. "**Account Debtor**" – the obligor on an Account.
   1.2. "**Active Account Debtor**" - an Account Debtor of Client which owes all or any portion of a Purchased Account to Company.
   1.3. "**Advance Rate**" - the percentage of the Face Amount of Purchased Accounts immediately available to the Client – per Schedule A.
   1.4. "**Affiliate**" or "**Affiliated**" - an individual, partnership, corporation, limited liability company, unincorporated person or otherwise (a "Person") which (i) directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, a Person; (ii) which beneficially owns or holds 5% or more of any class of the voting stock or equity interests of a Person; or (iii) 5% or more of the voting stock or equity interest of which is beneficially owned or held by a Person or its subsidiary.
   1.5. "**Balance Subject to Finance Fees**" – the difference between the unpaid Face Amount of Purchased Accounts and the Reserve Account – but only to the extent that a Finance Rate is designated as applicable, per Schedule A.
   1.6. "**Carrier**" – any person providing motor vehicle transportation for compensation.
   1.7. "**Carrier Payment Period**" – time period, subsequent to Purchase Date, during which Company will issue payment to Carriers engaged by Freight Brokers.
   1.8. "**Carrier Settlement**" – per load documentation, between Freight Broker and Carrier, summarizing the terms and conditions, delivery confirmation, advances and/or other adjustments, if any, and final calculation of Carrier payment amounts for each load.
   1.9. "**Closed**" - a Purchased Account is closed upon Company's receipt of full payment from a Payor or the Client (including payment by a charge to the Reserve Account).
   1.10. "**Collateral**"- all of Client's now owned and hereafter acquired Accounts, Chattel Paper, Deposit Accounts, Inventory, Equipment, Instruments, Investment Property, Documents, Letter of Credit Rights, Commercial Tort Claims, and General Intangibles. Client assigns to Company any and all common law and statutory Carrier lien rights to secure payment of freight charges that inure to the benefit of Client with respect to any Account as well as all Goods covered by each bill of lading.
   1.11. "**Complete Termination**" – occurs upon satisfaction of the following conditions: (a) payment in full of all Obligations of Client to Company; (b) if Company has issued or caused to be issued guarantees, promises, or letters of credit on behalf of Client, acknowledgement from any beneficiaries thereof that Company or any other issuer has no outstanding direct or contingent liability therein and (c) Client has executed and delivered to Company a general release in a form prepared by and acceptable to Company.
   1.12. "**Default Fees**" – 1.5 times the fees listed in Schedule A, applicable only upon an Event of Default.
   1.13. "**Early Termination Fee**" – 5% of the Maximum Advance, applicable only if contract is terminated subsequent to the Early Termination Waiver Period or prior to end of the Term.
   1.14. "**Early Termination Waiver Period**" – period of time in which the Early Termination Fee is waived; that being 30 days.
   1.15. "**Eligible Account**" - an Account that is acceptable for purchase as determined by Company in the exercise of its reasonable sole credit or business judgment.
   1.16. "**Events of Default**" - see Section 10.1
   1.17. "**Expedited Settlement Fee**" – $25.00 or 1% of advance, whichever is greater, upon Client's request for payment of the Purchase Price by Company sooner than as provided in Section 2.6.
   1.18. "**Exposed Payments**" – payments received by Company from or for the account of a Payor that may subject Company to an avoidance claim under the United States Bankruptcy Code.
   1.19. "**Face Amount**" - the face amount due on an Account at the time of purchase.
   1.20. "**Factoring Fee**" - the Factoring Fee Percentage multiplied by the Face Amount of a Purchased Account, for each Factoring Fee period or portion thereof, that any portion thereof remains unpaid.
   1.21. "**Factoring Fee Percentage**" – per Schedule A.

EXHIBIT / —D.R. Client's Initials

1.22. **"Finance Fees"** - the product of the Finance Rate (if applicable, per Schedule A) multiplied by Balance Subject to Finance Fees.
1.23. **"Finance Rate"** - the rate per annum, expressed as a function of Prime Rate, if applicable, per Schedule A.
1.24. **"Freight Broker"** - any person that sells, provides or arranges for transportation for Carrier(s) for compensation.
1.25. **"Insolvent"** – as applied to an Account Debtor who has become Insolvent if, on or before the Repurchase Date, it is the subject of (i) a petition under any state or federal debtor relief or liquidation statute filed within the Insolvency Period, or (ii) a proceeding under Chapters 11 or 13 of the Bankruptcy Code filed or the conversion of said case to one under Chapter 7. The burden of proof as to the Insolvency of an Account Debtor shall rest solely on the Client, with it being presumed that at all relevant times an Account Debtor is not Insolvent.
1.26. **"Invoice"** - the document that evidences or is intended to evidence an Account. Where the context so requires, reference to an Invoice shall be deemed to refer to the Account to which it relates.
1.27. **"Invoice Documentation"** - all records necessary to support a claim for payment from an Account Debtor, whether in electronic or paper form, relating or supporting an Invoice, including bills of lading, receiving documents, shipping receipts, shipper contracts, rate confirmations and the like.
1.28. **"Maximum Advance"** – a self-imposed maximum amount of Purchase Price payments which Company, in its discretion, may advance to Client, per Schedule A.
1.29. **"Minimum Monthly Fee"** - the minimum value of monthly Factoring Fees, but applicable only after the first 90 days of the initial Term - $500 per month.
1.30. **"Obligations"** - all present and future monetary indebtedness, liabilities and obligations owing by Client to Company whether arising hereunder or otherwise, and whether arising before, during or after the commencement of any Bankruptcy Case in which Client is a Debtor.
1.31. **"Payor"** - An Account Debtor or entity making payment thereon for the account of such party.
1.32. **"Prime Rate"** - the "prime rate" as set forth in the Money Rates section of The Wall Street Journal or, if not available, Company will substitute a comparable index. For purposes of this Agreement, Prime Rate is subject to a minimum of 5% per annum. Company may adjust the Factoring Fee Percentage, either up or down, to reflect changes in the Prime Rate from the effective date of this Agreement.
1.33. **"Purchase Date"** - the date on which Client has been advised, either through writing or posting on daily settlement reports available to Client, that Company has agreed to purchase an Account.
1.34. **"Purchase Price"** - the Face Amount of a Purchased Account less the Factoring Fee.
1.35. **"Purchased Accounts"** - Accounts purchased hereunder which have not been Closed.
1.36. **"Quick Payment Fees"** – discount fee, if applicable (Freight Brokers only), charged to Carriers, for immediate payment processing.
1.37. **"Repurchase Period"** – per Schedule A.
1.38. **"Repurchase"** - an Account for which Client has paid to Company the then unpaid Face Amount.
1.39. **"Required Reserve Amount"** – the product of the unpaid balance of Purchased Accounts multiplied by the difference between 100% and the Advance Rate percentage, per Schedule A.
1.40. **"Reserve Account"** - a bookkeeping account on the books of the Company representing the portion of the Purchase Price which has not been paid by Company to Client.
1.41. **"Reserve Shortfall"** - the amount by which the Reserve Account is less than the Required Reserve Amount.
1.42. **"Schedule of Accounts"** - a form supplied by Company from time to time wherein Client lists such of its Accounts as it requests that Company purchase under the terms of this Agreement.
1.43. **"Setup Fee"** – per Schedule A.
1.44. **"Term"** – term of contract, per Schedule A.
1.45. **"Uniform Commercial Code"** – the Uniform Commercial Code as adopted in the state of Texas.

## 2. Sale; Purchase Price; Billing.

2.1. Client shall offer to sell to Company as absolute owner, with full recourse, such of Client's Accounts as are listed from time to time on each Schedule of Accounts.
2.2. Each Schedule of Accounts shall be accompanied by Invoice Documentation and such evidence supporting the Account as Company shall from time to time request.
2.3. At the time each Schedule of Accounts is delivered by Client to Company, Client must offer for sale to Company all Accounts owed to Client by an Active Account Debtor and any such Account created thereafter.
2.4. Client shall not, without the prior written consent of Company in each instance, change or modify the terms of the original Invoice or Invoice Documentation relating to any Active Account Debtor, Purchased Account or Accounts as are listed from time to time on each Schedule of Accounts.
2.5. Company may, in its sole and exclusive discretion, elect to purchase from Client such Accounts are offered for sale to Company and that Company determines to be Eligible Accounts.

2.6. Company shall pay to Client the Purchase Price of any Purchased Account, within one (1) business day of the Purchase Date, less any amounts due to Company from Client, including, without limitation, any fees, expenses and Reserve Shortfall whereupon the Accounts shall be deemed purchased hereunder.

2.7. Subject to the terms and conditions of this Agreement, Company is authorized to purchase Accounts upon telephonic, facsimile or other instructions received from any officer, employee or representative of Client.

2.8. Company may send a monthly statement to all Payors itemizing their account activity during the preceding billing period. All Payors shall have previously been or shall promptly be notified, in writing, as provided in Section 9, to make payments to Company.

3. **Fees and Expenses.** Client shall pay to Company the following items:

   3.1. **Factoring Fees.** The Factoring Fee on the date on which a Purchased Account is purchased, as well as for subsequent periods as applicable – per Schedule A.

   3.2. **Finance Fees.** Computed on the Balance Subject to Finance Fees on the first day of the month following the month in which it accrues, as applicable – per Schedule A.

   3.3. **Early Termination Fee.** Applicable only in the event that Client terminates this Agreement after the end of the Early Termination Waiver Period and other than at the end of the Term.

   3.4. **Out-of-pocket Expenses.** The out-of-pocket expenses directly incurred by Company in the administration of this Agreement such as wire transfer fees, electronic funds transfer fees, postage and audit fees – per Schedule A, subject to economic adjustment.

   3.5. **Field Audit Expenses.** $750 per day plus travel expenses in respect to each audit, applicable only if Purchased Accounts exceeds $1,000,000 or upon an Event of Default. Except for an Event of Default, Client shall not be required to pay for more than two audits per twelve-month period.

   3.6. **Other Charges.** Other fees and expenses as specified in this Agreement including, upon each occurrence, Expedited Settlement Fees.

4. **Reserve Account.**

   4.1. Company shall pay to Client on the 15th and the last business day of each month any amount by which the Reserve Account exceeds the Required Reserve Amount, subject to Company's right to charge the Reserve Account with any Obligations.

   4.2. Company may pay any amounts due Client hereunder by making a credit to the Reserve Account.

   4.3. Client shall pay to Company on demand the amount of any Reserve Shortfall. If a Reserve Shortfall continues to exist for ten (10) days after notice of same is issued by Company, Client shall pay on the Reserve Shortfall, as a debit to the Purchase Price paid or payable by Company, at an annual rate equal to the lesser of (i) nine percentage points (9%) in excess of Prime Rate, or (ii) the maximum rate permitted by law, and the interest charges will continue until the Reserve Shortfall is eliminated. The imposition of such interest charges shall not be deemed to excuse a late payment or be deemed a waiver of any other rights of Company under this Agreement.

   4.4. Company may retain the Reserve Account for ninety days following termination of this Agreement, to be applied to, *inter alia*, payment of any Obligations that were unknown to Company at the time of termination, and until Complete Termination.

5. **Account Disputes.** Client shall promptly notify Company of all disputes concerning any Purchased Account and if, but only if, requested by Company in writing, will seek to settle all such disputes at Client's sole cost and expense. No final resolution shall be made without Client having first obtained Company's express authorization. Company shall at all times be irrevocably authorized, but not required, to settle, compromise, or litigate (collectively, "Resolve") any dispute upon such terms, as Company in its sole discretion deems advisable, without otherwise seeking Client's consent. Upon the occurrence of an Event of Default Company may Resolve such issues with respect to any Account of Client.

6. **Repurchase Of Accounts.** Company may, on demand, or, at Company's option, by Company debiting the Reserve Account or by requiring payment of the then unpaid Face Amount thereof, require that Client Repurchase a Purchased Account together with any unpaid fees including those as described in section 3 above, upon the occurrence of the following:

   6.1. Any Purchased Account, the payment of which has been disputed by a Payor, Company being under no obligation to determine the bona fides of such dispute;

   6.2. Any Purchased Account regarding which Client has breached any warranty or covenant as set forth in the Section 8 and 9.

   6.3. Any Purchased Account in respect to which (a) in Company's reasonable credit judgment a Payor has become Insolvent or (b) a Payor has indicated an inability or unwillingness to pay the Purchased Account when due;

   6.4. All Purchased Accounts upon occurrence of an Event of Default or upon the termination date of this Agreement; and

   6.5. Any Purchased Account that remains unpaid beyond the Repurchase Period.

7. **Security Interest**. To enable Company to perfect its ownership interest in the Purchased Accounts and to secure the Obligations, Client grants to Company a continuing first priority ownership interest in the Purchased Accounts and a security interest in the Collateral. Notwithstanding the creation of this Security Interest, the relationship of the parties constitutes an Account Purchase Transaction as described in Section 24.

8. **Representation and Warranties**. Client represents and warrants that:
    8.1. It is fully authorized to enter into this Agreement and to perform hereunder;
    8.2. This Agreement constitutes its legal, valid and binding obligation;
    8.3. None of the preprinted text of this Agreement has been altered, modified, or stricken by Client or anyone else;
    8.4. Client or its authorized representative properly executed this Agreement in Client's name and all signatures on this Agreement are genuine;
    8.5. Client is solvent, in good standing in the jurisdiction of its organization and able to pay its debts as they mature;
    8.6. Client has filed all tax returns and required reports and is current on payment of all taxes, assessments, fees and other governmental charges;
    8.7. Client holds, and will hold until Complete Termination, a valid operating permit to transact business as a Motor Carrier and/or Freight Broker; and
    8.8. All financial statements and information relating to Client which have been furnished by Client to Company are true, correct and complete in all material respects, and there have been no material adverse changes in the condition (financial or otherwise) of Client since submission.

9. **Covenants By Client**.
    9.1. The Purchased Accounts are and will remain: (a) bona fide existing obligations created by the full and complete rendition of services or the unconditional sale and delivery of goods in the ordinary course of Client's business; (b unconditionally owed and will be paid to Company in full without any assertion of a defense, dispute, offset, counterclaim, or right of return or cancellation, other than Accounts owed by an Account Debtor which becomes subject to any bankruptcy or state debtor relief proceeding; and (c) sales made to any entity that is not Affiliated with Client or will at all times represent an "arms length" transaction.
    9.2. Client shall not create, incur, assume or permit to exist any security interest or lien or any form of adverse ownership interest or claim upon or with respect to any of the Purchased Accounts or Collateral in which Company now or hereafter holds an ownership or a security interest.
    9.3. Before sending any Invoice to an Account Debtor, Client shall mark same with the form of notice of assignment required by Company.
    9.4. Client shall not solicit from any Account Debtor any form of payment in respect to a Purchased Account or any Account offered for sale to Company. Should Client receive payment of all or any portion of any Purchased Account, Client shall immediately notify Company of receipt of the payment, hold said payment in express trust for Company separate and apart from Client's own property and funds, and deliver said payment to Company without delay in the identical form in which received by no later than the next banking day following the date of receipt.
    9.5. Client, within two (2) business days of the following, shall provide Company with written Notice of (a) any billing dispute including, but not limited to, any challenge by a shipper or Payor as to rate, damage to cargo or claim for loss or (b) actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of any Active Account Debtor.
    9.6. Client shall not, without the prior written consent of Company (a) grant any extension of time for payment of any Accounts, (b) compromise or settle any Accounts for less than the full amount thereof, (c) release in whole or in part any Payor, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any Accounts.
    9.7. Client shall timely pay all payroll and other taxes, and shall provide proof thereof to Company in such form as Company shall reasonably require.
    9.8. Client shall fully complete and execute, as taxpayer, prior to or immediately upon the execution of this Agreement, a form 8821 (Rev. August 2008) (Rev. January 2010) or form 4506-T (Rev. January 2010) issued by the Department of the Treasury, Internal Revenue Service or such other forms as may be requested by Company, irrevocably authorizing Company to, among other things, inspect or receive tax information relating to any type of tax, tax form, years or periods or otherwise desired by Company on an ongoing basis.
    9.9. Client shall maintain insurance at all times covering such risks and in such amounts as required by the Federal Motor Carrier Safety Administration, and all such insurance shall be in such form and written by such companies acceptable to Company.
    9.10. Client will not knowingly accept to haul any load that has been double brokered, nor will it attempt to or actually double broker any load.
    9.11. Client shall not sell, transfer or assign more than 20% of Client's assets to any non-Affiliate without first receiving Company's written consent    From time to time as requested by Company, Company or its designee shall

have access, during reasonable business hours (if prior to an Event of Default and at any time if on or after an Event of Default), to all premises where Collateral is located for the purposes of inspecting (and, if after the occurrence of an Event of Default removing) any of the Collateral, including Client's computers, books and records, and Client shall permit Company or its designee to make copies or extracts therefrom. Client hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Company at Client's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Client.

9.12. Company shall at no time be a deemed fiduciary of the Client, although Client may be a fiduciary of the Company.

## 10. Default.

10.1. **Events of Default.** The following will constitute an Event of Default hereunder: (a) Client's failure to pay any one or more Obligations or perform any provision hereof or of any other agreement now or hereafter entered into with Company; or any covenant, warranty or representation contained herein proves to be false in any way, howsoever minor, (b) Client or any guarantor of the Obligations becomes subject to any bankruptcy, or state debtor-relief proceeding such as an assignment for the benefit of creditors or becomes subject to the appointment of any receivership, (c) any guarantor fails to perform or observe any of such guarantor's duties or obligations to Company or shall notify Company of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, (d) Client fails to offer any bona fide Account for a period of more than thirty (30) days from the date the last Account was offered for sale by Client; and (e) Company, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations or any other required performance under this Agreement.

10.2. **Effect of Default.** Upon the occurrence of any Event of Default, in addition to any rights Company has under this Agreement or applicable law, Company may without formally terminating this Agreement, deem all Obligations immediately due and payable without notice and all fees shall accrue and be payable at the Default Fees rate.

11. **Authorization to Company.** Client authorizes Company and irrevocably grants power of attorney to Company to exercise any of the following powers until all of the Obligations have been paid in full and a Complete Termination has been performed:

11.1. **At All Times:** (a) Receive, take, endorse, assign, deliver, accept and deposit, in the name of Company or Client, any and all proceeds of any Collateral securing the Obligations or the proceeds thereof; (b) Take or bring, in the name of Company or Client, all steps, actions, suits or proceedings deemed by Company necessary or desirable to effect collection of or other realization upon Company's Accounts; (c) File any claim under any bond or under any trust fund; (d) Pay any sums Company, in its sole and exclusive discretion, deems necessary to protect its interests under this Agreement, including the discharge of any lien or encumbrance which may be senior to Company's ownership rights or security interest in any assets of Client, which sums shall thereafter be included as Obligations hereunder; (e) File in the name of Client or Company, or both, mechanics lien or related notices, or claims under any payment bond, in connection with goods or services sold by Client in connection with the improvement of realty; (f) Notify any Payor obligated on an Account, that, *inter alia*, the Account has been assigned to Company by Client and that payment thereof is to be made to the order of and directly and solely to Company; (g) Communicate directly with Client's Payors to verify the amount and validity of any Account created by Client; (h) Accept, endorse and deposit any checks tendered by an Account Debtor "in full payment" of its obligation to Client and Client shall not assert against Company any claim arising therefrom, irrespective of whether such action by Company effects an accord and satisfaction of Client's claims, under §3-311 of the Uniform Commercial Code, or otherwise; (i) File, amend and correct any addresses with the proper federal, state and local transportation authorities and (j) Affix an electronic version of the signature of Client to any notification of assignment or other communication sent by Company to an Account Debtor, the Internal Revenue Service or other governmental or regulatory agency.

11.2. **Upon an Event of Default:** (a) Change the address for delivery of mail to Client and to receive and open mail addressed to Client; (b) Extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts and discharge or release any Account Debtor or other obligor (including filing of any public record releasing any lien granted to Client by such Account Debtor), without affecting any of the Obligations or Company's rights under this Agreement; (c) Initiate electronic debit or credit entries through the ACH system to any deposit account maintained by Client; (d) In the event Company deems it necessary to seek equitable relief, including, but not limited to, injunctive or receivership remedies, as a result of an Event of Default, Client waives any requirement that Company post or otherwise obtain or procure any bond. Alternatively, in the event Company, in its sole and exclusive discretion, desires to procure and post a bond, Company may procure and file with the court a bond in an amount up to and not greater than $10,000.00 notwithstanding any common or statutory law requirement to the contrary. Upon Company's posting of such bond it shall be entitled to all benefits as if such bond was posted in compliance with state law. Client waives any right it may be entitled to, including an award of attorney's fees or costs, in the event any equitable relief sought by and

awarded to Company is thereafter, for whatever reason(s), vacated, dissolved or reversed and (e) Implement Default Fees

11.3. **Financing Statements:** File any initial financing statements and amendments thereto that: (a) Indicate the Collateral as all assets or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code, or as being of an equal or lesser scope or with greater detail; (b) Contain any other information required by part 5 of Article 9 of the Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the Client is an organization, the type of organization, and any organization identification number issued to the Client; (c) Contain a notification that Client has granted a negative pledge to the Company, and that any subsequent lienor may be tortiously interfering with Company's rights; (d) Advise third parties that any notification of Client's Account Debtors will interfere with Company's collection rights and (e) File any Correction Statement under Section 9-518 of the Uniform Commercial Code that Company reasonably deems necessary to preserve its rights hereunder.

## 12. Termination; Effective Date.

12.1. **Term.** This Agreement will be effective on the date it is executed and accepted by Company ("Effective Date"), and shall continue for the Term. This Agreement shall be automatically extended for successive Terms from the later of the Effective Date or the date of any executed modification, unless Client shall provide at least thirty (30) days, but not more than sixty (60) days, prior written notice to Company of its intention to terminate. Upon receipt of such notice, this Agreement will terminate on the last date of the current Term or, if prior to that date, on the specified "Early Termination Date." Company may terminate this Agreement at any time by giving Client thirty (30) days prior written notice of termination, or at any time without notice upon the occurrence of any Event of Default.

12.2. **No Lien Termination without Release.** In recognition of the Company's right to have a Complete Termination, notwithstanding payment in full of all Obligations by Client, Company shall not be required to record any terminations of any financing statement or satisfactions of any of Company's ownership rights or Security Interest in the Collateral unless and until Complete Termination has occurred. Client understands that this provision constitutes a waiver of its rights under §9-513 of the Uniform Commercial Code.

13. **Account Stated.** Company intends to provide Client with information on the Purchased Accounts which may include a monthly reconciliation of the factoring relationship relating to billing, collection and account maintenance such as aging, posting, error resolution and mailing of statements or equivalent internet access to such information. All of the foregoing shall be in a format and in such detail, as Company, in its sole discretion, deems appropriate. Company's books and records or electronic data shall be admissible in evidence without objection as prima facie evidence of the status of the Purchased Accounts, non-Purchased Accounts and Reserve Account between Company and Client. Each statement, report, or accounting rendered or issued by Company to Client or maintained by Company through Internet access shall be deemed conclusively accurate and binding on Client unless within fifteen (15) days after the date of issuance or posting of such information Client notifies Company to the contrary by registered or certified mail, setting forth with specificity the reasons why Client believes such statement, report, or accounting is inaccurate, as well as what Client believes to be correct amount(s) therefore. Client's failure to receive any monthly statement shall not relieve it of the responsibility to request such statement and Client's failure to do so shall nonetheless bind Client to whatever Company's records would have reported.

14. **Indemnification.** Client agrees to indemnify Company against and save Company harmless from any and all manner of suits, claims, liabilities, demands and expenses, whether directly or indirectly, resulting from or arising out of this Agreement including the transactions or relationships contemplated hereby (including the enforcement of this Agreement), and any failure by Client to perform or observe its duties under this Agreement. In no event will Company be liable to Client for any lost profits, lost savings or other consequential, incidental or special damages resulting from or arising out of or in connection with this Agreement, the transactions or relationships contemplated hereby or Company's performance or failure to perform hereunder, even if Company has been advised of the possibility of such damages.

15. **Avoidance Claims.** Client shall indemnify Company from any loss arising out of the assertion of any claim that any payment received by Company is avoidable under any provision of the United States Bankruptcy Code or any other debtor relief statute ("Avoidance Claim") and shall pay to Company on demand the amount thereof. Client shall notify Company within two business days of it becoming aware of the assertion of an Avoidance Claim. This provision shall survive termination of this Agreement and Client's failure to pay within ten (10) days of demand shall enable Company to treat any rights under this Agreement that may have been previously terminated or released reinstated until such time as the amount owing is paid.

16. **Exposed Payments.** Upon termination of this Agreement Client shall pay to Company (or Company may retain to be held in a non-segregated non-interest bearing account) the amount of all Exposed Payments (the "Preference Reserve"). Company may charge the Preference Reserve with the amount of each Exposed Payment that Company pays to the bankruptcy estate of the Payor that made the Exposed Payment, on account of a claim asserted under the Bankruptcy Code. Company shall refund to Client from time to time that balance of the Preference Reserve for which a claim under the Bankruptcy Code can no longer be asserted due to the passage of the statute of limitations, settlement with the bankruptcy estate of the Payor or otherwise.

17. **Successor Entity.** In the event Client's principal(s), officer(s) or director(s), during the Term of this Agreement or while Client remains liable to Company for any Obligations under this Agreement, directly or in conjunction with any other person, causes to be formed a new entity or otherwise become associated with any newly formed or existing entity, whether corporate, partnership, limited liability company or otherwise, such entity shall be deemed to have expressly assumed the Obligations Client owes Company under this Agreement unless Company is first notified of such association and expressly consents, in writing, to a waiver of Company's rights under this section. With respect to each such entity, Company shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity, a new UCC-1 financing statement naming such entity as Debtor, and to have it filed with any and all appropriate secretaries of state or other UCC filing offices. Company shall be held harmless by Client and its principals, officers or directors and be relieved of any liability as a result of Company's filing of any such financing statement or the resulting perfection of its ownership or Security Interests in such entity's assets. In addition, Company shall have the right to notify such entity's Account Debtors of Company's rights, including without limitation, Company's right to collect all Accounts, and to notify any creditor of such entity that the Company has rights in such entity's assets.

18. **Attorneys' Fees; Expenses.** Client agrees to reimburse Company, on demand, for the actual amount of all costs and expenses, including attorneys' fees, which Company may incur in (a) enforcing this Agreement and any documents prepared in connection herewith, (b) protecting, preserving or enforcing any lien, Security Interest or other right granted by Client to Company or arising under applicable law, whether or not suit is brought, including but not limited to the defense of any Avoidance Claims; (c) in defense of Company's ownership rights in the Purchased Accounts or its interest in the Collateral including its priority; or (d) in connection with any federal or state insolvency proceeding commenced by or against Client, or any subpoena or other legal process in any way relating to Client, including those arising out of the automatic stay, seeking dismissal or conversion of the bankruptcy proceeding or opposing confirmation of Client's plan there under. This provision shall survive termination of this Agreement. Notwithstanding the existence of any law, statute, rule or otherwise, in any jurisdiction which may provide Client with a right to attorney's fees or costs, Client hereby waives any and all rights to seek such attorney's fees or costs and Client agrees that Company exclusively shall be entitled to indemnification and recovery of any and all attorney's fees or costs in respect to any litigation based hereon, arising out of, or related hereto, whether under, or in connection with, this and/or any agreement executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of either party.

19. **Entire Agreement.** Client acknowledges that no promise of any kind has been made by Company or any third party on behalf of Company to induce Client to execute this Agreement except to the extent expressly contained herein and that this Agreement, and any other agreement executed in connection herewith, is the product of joint negotiations such that no portion of this Agreement shall be construed against or in favor of either party No course of dealing, course of performance or trade usage, and no parole evidence of any nature, may be used to supplement, alter or modify any terms of this Agreement. Unless otherwise expressly stated in any other agreement between Company and Client, if a conflict exists between the provisions of this Agreement and such other agreement, the provisions of this Agreement shall control.

20. **Amendment and Waiver.** Only a writing signed by all parties hereto may amend this Agreement. No failure or delay in exercising any right hereunder shall impair any such right that Company may have, nor shall any waiver by Company hereunder be deemed a waiver of any default or breach subsequently occurring. Company's rights and remedies herein are cumulative and not exclusive of each other or of any rights or remedies that Company would otherwise have.

21. **Severability.** In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the remaining provisions contained herein shall not in any way be affected or impaired thereby.

22. **Choice of Law.** This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Texas.

23. **Venue; Jurisdiction.** Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Company so elects, be instituted in any court sitting in Dallas County, Texas or, if none, any court sitting in the State of Texas (the "Acceptable Forums"). Client agrees that the Acceptable Forums are convenient to it, and submits to

the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum by Client, Client waives any right to oppose any motion or application made by Company to transfer such proceeding to an Acceptable Forum. Client agrees that Company may effect service of process upon Client by regular mail at the address set forth herein or at such other address as may be reflected in the records of Company, or by service upon Client's agent for the service of process.

24. **Account Purchase Transaction.** Client confirms and acknowledges that it does business as a commercial enterprise and that this Agreement is intended to be an "account purchase transaction," as is authorized by Texas Finance Code §306.003(b) conclusively establishing that this Agreement is not one for the use, forbearance or detention of money. Client further acknowledges that in accordance with 9-318 of the UCC, Client will not retain any legal or equitable interest in any Purchased Account sold under this Agreement.

25. **Jury Trial Waiver.** THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER OR IN ANY WAY RELATED OR INCIDENTAL TO THE DEALINGS OF ANY OF THE PARTIES HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE. THE PARTIES FURTHER WAIVE ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.

26. **Assignment.** Company may, without notice, assign its rights and delegate its duties hereunder. Upon such assignment or delegation, Client shall be deemed to have attorned to such assignee and shall owe the same duties and obligations to such assignee and shall accept performance hereunder by such assignee as if such assignee were Company.

27. **Counterparts.** This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart shall thereafter also promptly deliver a manually executed counterpart, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

28. **Notice.** All notices required to be given to any party other than Company shall be deemed given upon the first to occur of (a) deposit thereof in a receptacle under the control of the U.S. Postal Service, (b) transmittal by electronic means to a receiver under the control of such party, or (c) actual receipt by such party or its employee or agent. All notices to Company shall be deemed given upon actual receipt by a responsible officer of Company. For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate.

|  | **CLIENT** | **COMPANY** |
|---|---|---|
| Address: | 13 Beechnut Drive<br>South Barrington, IL 60010 | 701 Canyon Drive, Suite 105<br>Coppell, Texas 75019 |
| Officer: | Dragan Rankovic | George Thorson |
| Fax Number: | (630) 766-0405 | (214) 513-9611 |
| Email: | midwestcs@hotmail.com | gthorson@abcllc.com |



IN WITNESS WHEREOF, the parties have executed this agreement on the day and year first above written.

Client: MIDWEST CARRIER SYSTEM, INC.

*Please sign name clearly within box*

By: _[signature]_

Name: Dragan Rankovic
*Print or type full legal name*

Title: President

Witness: _[signature]_

Sworn and subscribed before me this Oct day of 30th, 2012.

_[signature]_ Notary Public Signature

(seal) OFFICIAL SEAL
JEANETTE Y. MEHTA
Notary Public - State of Illinois
My Commission Expires Apr 07, 2013

Company: Advance Business Capital LLC

By: _[signature]_

Name: GEORGE A THORSON

Title: EVP

ACCEPTANCE Date: 11/1/12

Location: Coppell, Texas



# FACTORING AND SECURITY AGREEMENT
## SCHEDULE A - PRICING AND TERMS

This Schedule shall apply to that Factoring and Security Agreement dated October 29, 2012 by and between Advance Business Capital LLC ("Company") and **MIDWEST CARRIER SYSTEM, INC.** ("Client").

| | | | |
|---|---|---|---|
| Maximum Advance | $450,000 | | |
| Term | One (1) Year | | |
| Advance Rate | 95% | | |
| Repurchase Period | 90 days | | |
| Finance Rate | Prime Rate plus ___% or ☒ Not Applicable | | |
| Factoring Fee | | Percentage | Period |
| | Initial Period | 1.5% | 60 days |
| | Subsequent Periods | 0.35% | 15 days |
| Setup Fee | $150 | | |
| Wire Transfer Fee | $18 | | |
| Electronic Fund Transfer (ACH) | $10 | | |
| Express Checks | $3 for EFS Money Codes<br>$10 for Comchecks and TCheks | | |
| Cash4Truckers Fuel Card | No Charge (for loading) | | |
| Special Considerations | N/A | | |

| FREIGHT BROKERS ONLY | |
|---|---|
| Carrier Payment Period | Not Applicable |
| Quick Payment Discount | Not Applicable |



Client's Initials